*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2014-094

SEPTEMBER TERM, 2014

| | |
|---|---|
| In re A.S. and E.S., Juveniles | } APPEALED FROM: |
| | } |
| | } Superior Court, Washington Unit, |
| | } Family Division |
| | } |
| | } DOCKET NO. 153/154-12-10 Wnjv |

Trial Judge: Thomas J. Devine

In the above-entitled cause, the Clerk will enter:

Father appeals from the superior court's order terminating his parental rights with respect to his children, A.S., born in March 2007, and E.S., born in March 2008. We affirm.

Father and the children's mother, who voluntarily relinquished her parental rights on the first day of the termination hearing conditioned upon father's rights being terminated, married in 2007. During their marriage, the children were exposed to a high level of parental conflict, including verbal and physical abuse. Both A.S. and E.S. have profound special needs. A.S. has autism and developmental delays, while E.S. has global developmental delays and autism. Before the Department for Children and Families (DCF) became involved with them, the family was receiving a number of services, including occupational therapy and in-home developmental teaching. The service providers reported that, upon arriving at the family's home, they often found the children strapped into booster seats in front of a blaring television. At three years old, A.S. was pre-verbal and not toilet-trained.

DCF first became involved with the family in June 2010 after police responded to a report of a domestic altercation at the family's residence. Father began calling DCF after hours, leaving long, rambling messages threatening legal action against the Department based on its interference with his family. In late 2010, when father announced that he was removing the children from services, DCF filed a petition alleging that the children were in need of care or supervision (CHINS). The parents entered admissions to CHINS in January 2011. By that time, father had left the family home, and the parents were separated. Pending disposition, the children remained with mother under a conditional custody order.

Father did not appear at the disposition hearing held in February 2011. The court approved a disposition case plan that continued the conditional custody order and set a goal of restoring full custody to the mother. Services for father included individual therapy, domestic violence education, and supervised visitation. Father did not engage in services or participate in hearings for the next several months. DCF's increasing concern that the mother was not engaging in the case plan came to a head in July 2011, when E.S. was found by a stranger walking along the Paine Turnpike in Berlin, Vermont. There were indications that mother had been drinking at the time. DCF was granted custody of the children following this incident.

Father began having supervised visits with the children through the Family Time Coaching program in August 2011. Meanwhile, the children went through several foster placements because of their specialized needs. At age five, A.S. still did not maintain eye contact or respond to her name and was able to speak only a few words. She had the developmental level of a two or three-year old and displayed self-stimulating behavior. At age four, E.S. continued to display behaviors consistent with autism and had a developmental level of an eighteen-month-old child. The occupational therapist who conducted the children's evaluations attributed at least some of the children's developmental delays to early childhood trauma and the absence of important interactions during crucial stages of their childhood.

Father did not engage in individual counseling as required by the case plan until early 2012, and then quit after attending five appointments. He began counseling again shortly before the termination hearing. By May 2012, father was once again leaving long, ranting messages with DCF. In June 2012, father submitted to cognitive and psychological testing. During the interview with the evaluator, he revealed that he had been raised by a mentally ill mother who had been hospitalized on numerous occasions, that he was beaten regularly by his father, and that he had been sexually abused by an adult male when he was five years old. Father also described a history of significant substance abuse. The evaluator concluded that the test results were consistent with someone experiencing severe mental disorder. The evaluator further concluded that because father tended to present himself in an unrealistically positive light, he would not be highly motivated to seek mental health treatment.

At an August 2012 permanency review hearing, the superior court approved a case plan with concurrent goals of adoption or reunification with either parent. The new case plan called for father, among other things, to follow the recommendations of the psychological evaluation of him conducted in June 2012, attend individual therapy on a weekly basis, and work with service providers to help him engage with A.S. and E.S. and learn how to care for them.

In July 2013, the court granted father's request to expand visits to full days and then eventually overnights. The children, however, displayed negative behaviors at home and at school following the extended visits. Of particular concern were reports of sexualized behaviors by both children. Father denied that he inflicted any physical or sexual abuse on the children during the unsupervised visits. The children were not brought in for medical exams, and there is no direct evidence of any physical or sexual abuse.

In February 2013, DCF filed petitions to terminate each parent's parental rights. The termination hearing took place over three days in September 2013. Following the hearing, the court terminated father's parental rights, concluding that stagnation had occurred because of father's lack of progress in being able to care for the children and that the children's best interests warranted terminating his parental rights. The court found that despite a succession of coaches and over one hundred hours of supervised contact, father's ability to care for the children for extended blocks of time remained in doubt because of his lack of insight into the children's specialized needs and his unrealistic assessment of his own abilities to address those needs. The court found that father had not made progress in addressing his own mental health needs and had not made strong connections with service providers critical to his children's needs. The court concluded that given the uncertainty over whether father would be able to make progress toward addressing his own significant mental health issues, father's lack of insight regarding the children's specialized needs, and the children's overriding need for stability

and permanence, father was unlikely to be able to resume his parental duties within a reasonable period of time from the perspective of the children.

On appeal, father identifies specific findings and conclusions that he claims are not supported by the record. He first points to the court's finding that "a fair interpretation" of the children's sexualized behavior following unsupervised visits with father "is that father has failed to engage the children with the kind of consistency and insight their needs require." In support of this finding, the court paraphrased the occupational therapist's testimony as "predict[ing] that leaving the children with an untrained parent would almost inevitably result in extremely negative behaviors." Among its conclusions, the court repeated its statement that a "fair interpretation" of the children's negative behaviors following supervised visits "is that father failed to engage the children with the kind of consistency and insight their needs require," adding that "[b]ehaviors this extreme had not been seen before, and would appear to be a direct response to the increased time." Father contends that the court's "fair interpretation" statements are not supported by the occupational therapist's testimony. According to father, when asked if negative behaviors could be expected when untrained parents of children with special needs had unsupervised visits, the occupational therapist answered in the affirmative but provided only a general explanation that transitions to and from visits often resulted in negative behaviors. In short, father argues that there was no evidence that the children's negative behaviors were the result of, rather than coincident with, the increased visitation time with father.

Father may be right that the evidence does not support a causal connection between his ability to parent his children and the children's negative behaviors following unsupervised visits with him. Conceivably, those negative behaviors could stem more from the transition to a new regimen than from father's parenting ability. But the heart of the superior court's rationale for terminating father's parental rights remains unchallenged. The court found that both children had profound special needs requiring caregivers who could provide permanence in a stable and nurturing environment, who would engage in ongoing education and training on how to parent children with autism, and who would collaborate with service providers and be willing to accept feedback and guidance. These findings are supported in part by the occupational therapist's testimony and reports concerning the level of training and communication with service providers that would be required to successfully parent children with needs like A.S. and E.S.

For the following reasons the court found that father would be unable to meet the children's special needs. As the court stated, father's ability to be a successful parent rested on a foundation of his own good mental health, and yet father had failed to adequately address his significant mental health issues because of his belief that such treatment was not really necessary. The court also found that father lacked insight into the role he played in the children's traumatic childhood and did not appreciate the depth and complexity of the children's needs. The court further noted that father's relationship with service providers remained adversarial at times. Finally, the court noted that father remained unemployed and depended on his mother for housing. In short, the court terminated father's parental rights because over a lengthy period of time he had made little progress towards putting himself in a position to care for his special needs children. Even assuming that the record does not support a causal connection between the children's negative behaviors after father's visits and his parenting ability, the record overwhelming supports the court's termination order. See In re A.F., 160 Vt. 175, 178-79 (1993) (stating that erroneous finding does not require reversal where remainder of court's findings and conclusions support termination order).

3

Father also challenges the following statement concerning the stability of A.S.'s foster placement: "While it is unfortunate [the foster mother] has been unable to commit to adoption of [A.S.], she has indicated a willingness and ability to continue to provide a stable home for this child." Father argues that this statement is unsupported by the evidence, given that the foster mother testified only that A.S. was "welcome at my house as long she . . . needs a safe home," and a DCF caseworker testified that if a foster parent decided not to adopt, another foster placement would be sought for the child and any new foster parent would not be considered for adoption for at least six months. Thus, according to father, A.S.'s foster placement cannot be characterized as being stable.

We conclude that the challenged statement is supported by the evidence. The foster mother testified that she had not signed anything for adopting A.S. but that A.S. was welcome in her home as long as need be and that she was "not against adopting her if . . . that's how it comes about." The court accurately stated that although the foster mother had not committed to adoption, she indicated that was willing to continue to provide A.S. with a stable home, as she had been doing. In any event, even if the statement was not supported by the evidence, the record supports the court's termination order, for the reasons stated above. See In re S.B., 174 Vt. 427, 430 (2002) (mem.) (adoptive home is not prerequisite to termination of parental rights).

Affirmed.

BY THE COURT:

_____
John A. Dooley, Associate Justice

_____
Marilyn S. Skoglund, Associate Justice

_____
Beth Robinson, Associate Justice